## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| OLGA MALAVE, | ) | CASE NO. 1:18-CV-2747 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Olga Malave, ("Plaintiff" or "Malave"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a

Period of Disability ("POD") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before

the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and REMANDED for further

consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

## I.  PROCEDURAL HISTORY

On October 4, 2012, Malave filed an application for POD, alleging a disability onset date of June 12, 2012, due to a back injury, depression, asthma and chronic pain.  (Transcript ("Tr.") at 132.) The applications were denied initially and upon reconsideration, and on May 2, 2013, Malave requested a hearing before an administrative law judge ("ALJ").  (Tr. 180.)

On October 21, 2014, an ALJ held a hearing, during which Malave, represented by counsel, testified with the aid of an interpreter.  (Tr. 132.)  An impartial vocational expert ("VE") also testified.  (*Id.*)  On December 24, 2014, the ALJ issued a written decision finding Malave was not disabled.  (Tr. 126.)  Malave requested that the Appeals Council review this decision. (Tr. 340.)  The Appeals Council granted review, and, on May 3, 2016, vacated the December 24, 2014 decision, and remanded the case back to the ALJ for further proceedings and a new decision. (Tr. 153-160.)

A second hearing was held on October 10, 2016, and Malave, represented by counsel, again testified with the aid of an interpreter.  (Tr. 57).  An impartial vocational expert ("VE") also testified. (*Id.*)  On March 28, 2018, the ALJ issued a second written decision finding Malave was not disabled (Tr. 15).  The second decision became final on September 20, 2018, when the Appeals Council declined further review.  (Tr. 1-6).

On November 28, 2018, Malave filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17, 19). Malave asserts the following assignments of error:

(1)  The ALJ failed to consider the combined impact of Malave's mental disorders, pain, fatigue and inability to handle stress when the ALJ evaluated the opinions of the treating doctors.

(2)  The ALJ committed legal error in evaluating the treating physicians' opinions

2

pursuant to the requirements of SSR 96-2p.

    A.    The ALJ lacked substantial evidence to find that Dr. Vazquez's opinions were not supported by the evidence.

    B.    The ALJ lacked substantial evidence to reject Dr. Friess's opinion that Malave's symptoms, including pain and fatigue, prevented her from sustained work activity.

    (3)    The case should be remanded for the payment of benefits because the record adequately establishes that Malave is disabled and entitled to benefits.

(Doc. No. 15 at 1-2.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Malave was born in August 1983 and was 33 years old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 39.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has a limited education and the ALJ determined that she is able to communicate in English, although her medical records document that she required an interpreter in interactions with medical providers, and social security records show that she required an interpreter for basic phone communications with the social security office and at both her hearings.  (Tr. 39, 117, 132, 57.)  She has past relevant work as a blow-molding machine operator and packer.  (Tr. 110, 122.)

### B.    Relevant Medical Evidence[2]

#### 1.    Mental Impairments

In October 2012, Malave was referred to counseling by the court, after an incident where she

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

broke her ex-husband's wife's car windshield.  (Tr. 496.)  Dr. Vazquez, a psychiatrist at the Center for Families and Children, evaluated her.  (*Id.*)  Noting that she reported symptoms of depression since March of that year, the same month that her severe back pain began, he diagnosed her with depression "due in part to significant pain problems that have caused her to stop functioning," and prescribed the antidepressants Cymbalta and trazodone. (Tr. 496, 499.)

Malave agreed that her pain and depression were linked, writing in her disability appeal that "my depression is worse from all of this pain and suffering."[3]  (Tr. 418.)  She "felt that her pain is causing much of her anxiety and depression." (Tr. 721.)  At the same time, her social worker helped her identify other stressors that affected her mental health, such as poverty, conflicts with her son's father, her lack of education, and her struggles to communicate in English-speaking environments including law and medical offices.  (Tr. 713, 714, 715, 717, 718, 720, 724.)

In March 2013, Malave's social worker, Megan Raimondi-Musser, LSW, transitioned Malave's care to a new social worker.  (Tr. 725.)  After six months of regular care, Ms. Raimondi-Musser perceived Malave's situation as a combination of mental and physical impairments:

> Client experiences stress due to her physical condition (hip pain, inability to move much or do much around her home), her inability to work and lack of income, her struggles with the father of her son who wants custody.  Stress causes the client to feels [sic] down and sad and depressed and a little anxious, but mostly sad.  Client states that symptoms affect her every week, and that when she takes medication, it helps her "get through", but nothing has changed for better or worse.  (Tr. 725.)

The new social worker, Nadia James, documented that as the custody dispute surrounding her son became more contentious, Malave's feelings of depression and helplessness increased.  (Tr. 745, 747, 748, 754.)  Yet, when her family stressors were less intense, the pain in her back was still

---

[3] Due to Malave's inability to write in English, the form was completed by her social worker at the time, Megan Raimondi-Musser, LSW.

a constant stressor.  (Tr. 749.)  When her providers concluded that her back pain was a chronic condition, Malave was "asked how she'd response [sic] if she became convinced the pain were incurable, she began to [c]ry."  (Tr. 780.)  In August 2014, Ms. James noted that Malave "continues to struggle with feelings of depression and anxiety . . . . present on most days.  Client also suffers from chronic lower back and leg pain that makes it difficult for her to complete her [activities of daily living] at times."  (Tr. 905.)

Throughout this period, Malave was under the care of Dr. Eduardo Vazquez, who became her treating psychiatrist at the Centers for Families and Children in October 2012.  He initially assessed Malave as having "depression that is in part due to significant pain problems that have cause[d] her to stop functioning."  (Tr. 899.)  In July 2015 and January and May 2016, Dr. Vazquez noted that Malave's "anxiety and depression are fluctuating due to situational problems." (Tr. 960, 966, 970.)

On May 2, 2014, Dr. Vazquez provided an "Assessment of Ability to Sustain Work-Related Activities (Mental)."  (Tr. 878-881.)  He considered Malave's ability to "understand and remember very short and simple instructions" her strongest skill, indicating she could achieve this for 80% of an 8-hour workday.  (Tr. 878.)  Other relative strengths were skills she could sustain for 60-70% of an 8-hour-day:

- "work in coordination with or proximity to others," and

- "maintain socially appropriate behavior."

(Tr. 878-879.)  Skills that she could sustain for only 40-50% of an 8-hour workday included the ability to:

- "carry out short and simple instructions,"

5

- " sustain an ordinary routine,"

- "interact with the general public,"

- "accept instructions and respond appropriately to criticism,"

- "respond appropriately to changes in work setting," and

- "get along with co-workers or peers."

(Tr. 878-80.) Skills she would be able to sustain for only 20-30% of a normal 8-hour workday include:

- "complete a normal workday . . . without interruptions for psychologically based symptoms,"

- "perform at a consistent pace without an unreasonable number and length of rest periods,"

- "maintain attention and concentration for [2-hour] periods," and

- "deal with ordinary work stress."

(*Id*.) Dr. Vazquez described Malave's limitations in 2014 as: "depression has not changed much, low energy, low interest, withdrawn, poor concentration, poor memory, tired." (Tr. 879.)

On October 1, 2014, Dr. Vazquez described Malave's condition in his progress notes as "anxiety and depression are a little less because the father of her son does not come for him," but noted that she is "not able to function even when the stress is less." (Tr. 950-51.)

On September 16, 2016, Dr. Vazquez provided a second "Assessment of Ability to Sustain Work-Related Activities (Mental)." (Tr. 1026-29.) He stated that her diagnosis was "Major Depression Severe." (Tr. 1029.) His assessment gave a nuanced picture of Malave's abilities. He rated Malave's strongest skills more highly than in the previous assessment, indicating she could achieve them for 80% of an 8-hour workday:

6

- • "work in coordination with or proximity to others,"

- • "maintain socially appropriate behavior,"

- • "accept instructions and respond appropriately to criticism,"

- • "get along with co-workers or peers," and

- • "sustain an ordinary routine"

(Tr. 1026.)  He found she had a moderate ability in other areas, indicating that she could achieve these standards for 60% of an 8-hour workday:

- • "understand and remember very short and simple instructions," and

- • "carry out short and simple instructions."

(*Id.*)  He indicated that she was weaker in some critical areas, and she would be able to achieve these goals only 20% of a normal 8-hour workday:

- • "complete a normal workday . . . without interruptions for psychologically based symptoms,"

- • "perform at a consistent pace without an unreasonable number and length of rest periods,"

- • "interact appropriately with the general public,"

- • "maintain attention and concentration for [2-hour] periods"

- • "respond appropriately to changes in work setting," and

- • "deal with ordinary work stress."

(Tr. 1026-27.)  Dr. Vazquez described Malave's limitations in 2016 as:

> Because of her depression and anxiety, she has poor concentration and when ever she has try [sic] to work she is not able to perform at a natural speed and has been dismissed in days . . . . any stress causes her depression, concentration and energy to get worse and functioning to decrease significant [sic]"  (Tr. 1027-28.)

7

He observed that "she gets along with people but is distant, anxious and avoids interaction as much as possible." (Tr. 1027.)  He also noted that her medication caused sedation.  (Tr. 1028.)

On May 30, 2014, Nadia James, a licensed social worker who counseled Malave, also completed an "Opinion Regarding Claimant's Functioning." (Tr. 882-83.)  She was the professional who most closely observed Malave doing the activities of daily living, as she sometimes accompanied her on errands and medical and legal appointments.  (Tr. 73.)  James' assessment of Malave's functioning was grimmer than Dr. Vazquez's: she did not indicate that Malave could function satisfactorily in any area more than 45% of a normal 8-hour workday.  (Tr. 882.)  James explained that Malave "suffers from depression and anxiety. [Her] coping skills are poor and she is easily flustered by stress. [She has] poor problem solving skills."  (Tr. 883.)

The medical providers treating her pain also noted Malave's depression.  On March 12, 2013, Nurse Joanne Schneider at the Neurological Center for Pain Evaluation noted Malave's "depression, feelings of helplessness, decreased energy and anxiety."  (Tr. 780.)  On May 13, 2013, Dr. Marisa Wynne at MetroHealth noted Malave was "positive for depression."  (Tr. 802.)

## 2.    Physical Impairments

On March 2, 2012, Malave went to the emergency room complaining of lower back pain and a "funny feeling" down her right leg that had persisted for the past two days.  (Tr. 604.)   She was prescribed prednisone, naprosyn, and Percocet, but complained that these medications did not help her pain and made her sleepy.  (Tr. 599.)

Dr. Senthilkumar, a family practitioner at MetroHealth, saw her on March 6, 2012.  (*Id.*)  She noted that Malave described sensations "like ants crawling" and numbness on her back and leg.  (*Id.*)  She prescribed gabapentin.  (*Id.*)

8

Malave was then referred to MetroHealth's Department of Physical Medicine and Rehabilitation, where she received steroid injections for her pain. (Tr. 595.)

She was referred to the Pain Management Center at the Cleveland Clinic, where she was seen by Dr. Kenneth Grimm on July 26, 2012. He noted that, in the four weeks since her pain began, she had been taking gabapentin and diclofenac with "little benefit,"she had received a steroid injection that only provided one day of relief, and she had attended four physical therapy sessions "without benefit." (Tr. 520.) She reported that her symptoms worsened with activity, and improved slightly with rest and lying down. (Tr. 520, 524.) Dr. Grimm ordered an MRI of her lumbar spine and increased her dose of gabapentin. (Tr. 522.)

She attended physical therapy on September 29, 2012, and reported "constant" and "crushing" pain. (Tr. 529.) On October 3, 2012, she returned to the emergency room seeking relief from her back pain. (Tr. 632-640.) Dr. Haddad diagnosed "excerbation of chronic back pain and sciatica," and gave Malave additional medication to deal with the pain. (Tr. 642.)

At her next physical therapy appointment, Malave "became tearful and more painful with . . . exercise, and was not able to complete session." (Tr. 534-35.) Lyn Rieg, the physical therapist, noted that the medical records described the problem as lumbar spondylosis, thoracic or lumbosacral neuritis or radiculitis, unspecified. (Tr. 534.) Malave rated her pain as ten on a scale of one to ten. (*Id.*) Further therapy was postponed until Malave received another steroid injection to control the pain. (Tr. 535.)

Dr. Eric Freiss became Malave's treating physician at MetroHealth in 2012. On September 6, 2012, he saw her as a follow-up to an ER visit with severe vomiting and a positive stool sample. (Tr. 547.) At that visit, she reported "feeling much better." (*Id.*) He saw her on October 16, 2012,

9

and noted that she was complaining of lower back pain and right hip and leg pains.  (Tr. 543.)  She had been told that insurance would no longer cover steroid injections to help with the pain, and told Dr. Freiss that "pains and subsequent instability with gait prevent her from returning to her demanding factory job at this time."  (*Id.*)

The cause of Malave's back pain was unclear.  On August 2, 2012, she had an MRI of her lumbar spine.  (Tr. 488.)  This showed "mild degenerative disc disease at the L4/5 and L5/S1 levels."  (Tr. 489.)  In October 2012, Dr. Haddad at Cleveland Clinic's Lakewood Hospital diagnosed her with "sciatica."  (Tr. 636.)  In November 2012, Dr. Jeyaseelan at MetroHealth described her diagnosis as "[right] greater trochanteric bursitis with referred pain down lower extremity," but theorized the problem might be "discogenic."  (Tr. 697.)  On January 8, 2013, Dr. Marisa Wynne at MetroHealth ordered a CT scan, which showed "mild posterior disk [sic] bulging at the L5-S1 level."  (Tr. 806.)  By March of 2013, Dr. Grimm offered the "impression" that Malave suffered from "lumbosacral degenerative disc disease with radicular [right lower extremity] pain without dermatomal pattern."  (Tr. 808.)  He recommended her for treatment in MetroHealth's Chronic Pain Rehabilitation Program.  (Tr. 809.)  The nurse practitioner's notes suggest Malave has a "Pain disorder with medical and psychologic features."  (*Id.*)

What is clear is that Malave's pain was persistent.  In October 2012, Malave described feeling like "there are little ants" crawling all over her right side, which was both "numb" and hot.  (Tr. 408.)  In March 2013, she described her pain as "terrifying, exhausting and unbearable."  (Tr. 779.)  In May 2013, she described it as "constant throbbing," or "burning with numbness."  (Tr. 802, 849.)

On May 9, 2014, Dr. Freiss filled out a "General Medical Source Statement" detailing what he believed Malave could do despite her impairments.  (Tr. 1031-35.)  Dr. Freiss described Malave's

10

physical diagnosis as "trochanteric bursitis and chronic back pain." (Tr. 1031, 1035.)  He opined that she could:

- •    stand or walk a maximum of 3 continuous hours in an 8-hour workday,

- •    stand or walk a total of 6 hours in an 8-hour workday,

- •    sit a maximum of 2 continuous hours in an 8-hour workday, and

- •    sit a total of 6 hours in an 8-hour workday.  (Tr. 1033.)

He believed she would require a job that permitted her to shift from sitting to standing at will, and allowed her to take breaks at least every 2 hours.  (*Id.*)  He opined that emotional factors did not contribute to the severity of Malave's symptoms and functional limitations.  (Tr. 1031.)  He also noted that fatigue precipitated or worsened her pain, and her medications caused fatigue.  (Tr. 1032.)

Members of Malave's family also submitted testimonials regarding her medical condition. On May 30, 2014, her mother, Olga Rodriguez, wrote that "she has always been very active in sports and around the house, but now I am very concerned that she cannot do anything at all." (Tr. 444, 473[4].)  Her brother, Hector Padilla, wrote on the same day that Malave had previously been "happy and active . . . and now she can't do nothing becaus[e] her pain is permanent and terrible in which it makes me really sad that she's going through this pain and depression." (Tr. 445.)  On June 2, 2014, her sister, Jenny Malave wrote to "acknowledge Olga Malave's chronic pain since 2012. Because of this pain, she cannot do many things that she used to do before." (Tr. 454, 474.)  On May 27, 2014, a friend, Noemi Ruiz, wrote "I have knowledge of Olga Malave's chronic pain . . . . I acknowledge that she cannot complete movements or exert strength to the point that she has to stop

---

[4]    All the testimonial documents discussed in this paragraph, except for the letter from Hector Padilla, were submitted in Spanish.  The first citation is to the original document and the second is to the official translation.

everything because of this pain."  (Tr. 442-43, 471.)  Ruiz wrote that Malave "loses complete balance, which means that she has to be held up, or helped with her chores."  (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

State agency medical consultant Janet Souder, Psy.D., reviewed Malave's files on November 2, 2012.  (Tr. 103-07.)  State agency medical consultant Patricia Semmelman, Ph.D., reviewed Malave's files on January 30, 2013.  (Tr. 114-20.)  Both experts concluded that Malave had a medically determinable mental impairment, but that it was "not severe."  (Tr. 107, 119.)  The ALJ gave these assessments no weight in his decision, because "they are not consistent with the overall evidence of the record, including evidence that was not available for Drs. Souder and Semmelman's review."  (Tr. 35.)

### 2.    Physical Impairments

State agency medical consultant Dr. William Bolz reviewed Malave's files on November 3, 2012. (Tr. 108-10.)  Dr. Bolz did not find Malave's statements about the intensity, persistence and functionally limiting effects of her symptoms to be credible.  (Tr. 108.)  He determined that she had moderate exertional and postural limitations.  (*Id.*)  At the time of his review, he did not have any treating source opinions to consider.  (*Id.*)  State agency medical consultant Dr. Maureen Gallagher reviewed  Malave's files on January 30, 2013 and affirmed Dr. Bolz's assessment without further comment.  (Tr. 120-22.)  The ALJ gave these assessments considerable weight in his decision, but found that "the evidence as a whole also supports additional restrictions and a limitation to frequent balancing."  (Tr. 35.)

12

**D.**    **Hearing Testimony**

During the October 21, 2014 hearing, Malave testified to the following:

- She was 28 years old when she became disabled, and 31 years old at the time of the hearing.  (Tr. 1044.)

- She is 5 foot 4 inches tall and weighs about 194 pounds.  (*Id.*)

- She has gained about 50 pounds due to lack of exercise.  (Tr. 1045.)

- She is divorced and lives with her two children, a son who is ten years old and a daughter who is six years old.  (*Id.*)

- She lives in a two-story home, and goes up or down the stairs about five times a day. The pain in her leg makes the stairs difficult, so sometimes she has to go up the stairs sitting.  (Tr. 1045-46.)

- She has a valid driver's license and drives her sons to school five days a week, although this is hard for her because of her bad leg.  (Tr. 1046.)

- She attended school through tenth grade.  (*Id.*)

- Although she attended school in the United States, she did not become fluent in English because her school taught the non-English-speaking kids separately.  She can "understand a little bit" of spoken English, but cannot read or write it.  (Tr. 1047.)

- She started feeling pain on March 1, 2012.  She believes this is when she first became disabled because "I tried doing things, and I couldn't."  (*Id.*)

- On March 31, 2014, she returned to work part-time as a cleaner for Quality Assured Cleaning.  She worked three hours a day, five days a week.  She was fired after three months because she missed work approximately twice a week due to her pain.  (Tr. 1048.)

- Her pain medication makes her sleep.  When she is off the medication, she is awake and rates her pain at 8 on a scale of 1-10.  She has told her physician that the medication is not really helping her pain, and his response was that it is very strong medication and he can't give her anything else.  (Tr. 1051.)

- The physician told her that surgery was an option, "but he doesn't know if I can be the same."  (Tr. 1060.)

13

- The pain is in her lower back and goes down her right leg.  (Tr. 1052.)

- She can walk about 20 minutes before she needs to take a break.  (*Id.*)

- If she lifts more than five pounds, she feels pain and fears she will lose her balance. (*Id.*)

- She can sit for 15 minutes before she needs to stand up or lie down.  (Tr. 1053.)

- She was diagnosed with asthma as a child, and becomes short of breath easily.  She uses an inhaler to control her asthma as needed.  (*Id.*)

- She takes multiple medications for depression and anxiety.  (*Id.*)

- The medications effectively reduce her depression and lessen her anxiety and anxiousness.  (Tr. 1055.)

- She is not able to do any household chores, including preparing her own meals.  She relies on her children and her family who come over to help.  (Tr. 1056.)

- Her sister cooks and cleans for her.  (Tr. 1057.)

- Her brother does her laundry.  (*Id.*)

- Her sister, brother, and mother all do her shopping.  (*Id.*)

- She has no friends, and her family is her whole world.  (*Id.*)

- She tries to play games with her children, like Monopoly.  (Tr. 1058.)

- Without her family's help, she could not care for her children.  (Tr. 1060.)

- She does not have a computer, and does not know how to use one.  (Tr. 1058.)

- She bathes herself and takes care of her personal needs, but it's "very difficult." (*Id.*)

- Although her back pain is never relieved, "when I take my pills, I go to sleep, and I don't feel anything."  (*Id.*)

- At night, she sleeps for about four hours before she is woken by pain.  (*Id.*)

14

Case: 1:18-cv-02747-PAB  Doc #: 20  Filed:  10/22/19  15 of 39.  PageID #: 1224

- Her favorite job was factory work because it was high-paying.  She left that job when she was laid off.  (Tr. 1059.)

- She could not do that job now because of her back pain.  (*Id.*)

- At her prior jobs, she had somebody who would translate for her what she needed to do.  (Tr. 1060.)

- She can write in Spanish, but she "might miss a letter."  (*Id.*)

- When she was working in the factory, in other past jobs, she got along with coworkers, supervisors, and bosses ok.  (*Id.*)

- She no longer goes out in public.  She tries not to talk to people.  (Tr. 1061.)

During the October 20, 2016 hearing, Malave testified to the following:

- She is currently 5 feet 4 inches tall and weighs 195 pounds.  (Tr. 74.)

- She believes she last worked on July 24, 2016.  She was working for a cleaning company four hours a day, five or six days a week.  Her job was to vacuum, sweep, mop, and clean bathrooms. (Tr. 63.)

- While at her last job, she would sit whenever she was able.  Working made her very tired, very depressed, and caused her foot to swell.  She had difficulty doing the job because she would lose her balance.  (Tr. 64.)

- She was fired after three months because she was working too slowly and "wasn't vacuuming like I was supposed to."  (*Id.*)

- She was part of a team of three cleaners, but liked to work alone.  "I would go on like my own way and do my own thing."  (*Id.*)

- While she was working in 2016, her mother watched her children.  (Tr. 75.)

- In 2013 and 2014, she also worked as a cleaner.  She was fired from the cleaning job in 2014 because "I wasn't doing the job correctly. . . . You have to constantly pass the vacuum and, and do some dusting.  And I would get tired too quickly.  So I would take my breaks and sit."  (Tr. 65.)

- She liked her packing job, which she held in 2008, before she began experiencing pain.  She was able to work quickly then, and could work for 10 hours without complaining.   (*Id.*)

15

- It was fast-paced assembly line work, assembling and nesting boxes.  She lifted 25 to 30 pounds.  She left the job when she was switched to a night shift.  (Tr. 66.)

- When working in the box factory, she alternated time on the packing line and box closing.  She split her day between standing and sitting, sometimes sitting for up to 2-4 hours of her shift.  (Tr. 76, 77, 78, 79.)

- She is still in treatment with Dr. Vazquez, whom she has been seeing since 2012.  She currently sees him every 3 months.  Before, she saw him more often.  (Tr. 67.)

- Dr. Vazquez communicates with her in Spanish.  (*Id.*)

- He knows that she tried to work.  When she lost her job, she became depressed.  Dr. Vazquez told her "not to feel that way because at least I had tried."  (Tr. 68.)

- She only spends time with her immediate family members: her children, her mother, and her brother, because with anyone else "I don't feel sure of myself."  (*Id.*)

- At her last job, she sometimes missed work because she was very tired and in too much pain to go.   (*Id.*)

- She cannot sleep at night without taking medication.  (Tr. 69.)

- The medication she takes for her pain doesn't help her pain but it makes her tired all day.  (*Id.*)

- Her doctor knows that the pain medication isn't helping her, but "he says that's the strongest medicine he can give me."  (*Id.*)

- She has a stationary bike at home that she tries to ride, but she cannot ride for more than 10 to 15 minutes because it increases her pain.  She tries to ride daily, but she can't.  (Tr. 70.)

- She uses a cane when she goes to stores or takes her children to school, because she loses her balance.  It was not prescribed by a doctor.  (*Id.*)

- The doctor told her that her pain is caused by pinched nerves.  (*Id.*)

- She went back to work this year because she wanted to be able to get things for her children.   (*Id.*)

- She is not looking for work anymore because "I feel like I'm not going to be able

to do it anymore."   (Tr. 71)

- Last year, she tried volunteering in her childrens'school, cleaning the lunch tables. She was there only at lunchtime, for a school year.  She stopped volunteering because of her depression.  (*Id.*)

- When her family comes to visit, they cook and clean for her.  (*Id.*)

- She drives her kids to school in the morning, comes home and lies down, then gets up and drives to pick them up after school.  (Tr. 72.)

- After school, the children do school assignments or she will play table games with them.  (*Id.*)

- She needs help with grocery shopping because she cannot lift bags with things in them.   (*Id.*)

- She gets help twice a week from a social worker at the Center for Families and Children.  The social worker helps her shop, helps read the letters that Malave receives but can't understand, and "she gives me advice that I truly need." (Tr. 73.)

- She drives to these appointments.  Usually, they take place at the office of the Center for Families and Children.  Sometimes, they go into the community to run Malave's errands together.  (*Id.*)

- Dr. Vazquez works at the same office of the Center for Families and Children. (*Id.*)

- She hurt her right foot in 2014, ad has experienced pain there ever since.  Her foot still swells 2 or 3 days a week. She rates the foot pain 8 out of 10 on an average day (Tr. 80, 82.)

- She has pain starting in her lower back, running though her right hip, and down her leg to her right foot.  She rates the lower back pain 8 out of 10 on an average day, and the hip pain 9 out of 10 on an average day, even with medication. (Tr. 81.)

- She lives with her children, ages twelve and eight.  (Tr. 82.)

- She drives her children to and from school.  Driving scares her, and causes pain through her whole leg, "but I do it because it's my obligation with my kids."  (Tr. 83.)

- When she was working, she "got along well" with her bosses, supervisors and coworkers.  (Tr. 83.)

17

- Now, she has trouble entering a crowded store, and tries to grocery shop during the week and in the morning, when the store is not as crowded.  (*Id.*)

- She suffers from pain, depression and anxiety.  She believes that both her physical and mental ailments together prevent her from working, but that each, separately, would also prevent her from working.  (Tr. 84-85.)

The VE testified Malave had past work as a packer and a blow-molding-machine operator.

(Tr. 88-91.)  The ALJ then posed the following hypothetical question:

> Imagine a hypothetical individual with Malave's vocational profile who is limited to the performance of light work as defined under the regulations, except that she is able to occasionally climb ladders, ropes or scaffold; stoop, kneel and crouch; frequently climb ramps and stairs, balance and crawl.  She should avoid concentrated exposure to fumes, odors, dust, gasses, and poorly ventilated areas.  She is further limited to frequent interactions with the public, coworkers and supervisors; and to jobs that do not require reading or writing in English above the unskilled level. Would that hypothetical individual be able to perform any of Malave's past work? Are there other jobs this hypothetical individual could perform?

(Tr. 94-95.)

The VE testified that the hypothetical individual would not be able to perform Malave's past

work as a hand packager or machine operator.  (Tr. 94.)  The VE further explained the hypothetical

individual would be able to perform other representative jobs in the economy, such as housekeeping,

cleaner, or carwash attendant.  (Tr. 95.)

The ALJ next asked the VE to consider the same hypothetical, but change the exertion level

of the hypothetical individual to "sedentary."  (Tr. 96.)  The VE replied that there were no jobs at the

sedentary level that the hypothetical individual could perform that did not require reading and writing

in English above the "unskilled" level.  (Tr. 98.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when he

18

became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Malave was insured on her alleged disability onset date, June 12, 2012, and remained insured through June 30, 2017, her date last insured ("DLI.") (Tr. 24.) Therefore, in order to be

entitled to POD, Malave must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on June 30, 2017 (15D).

2.    The claimant did not engage in significant gainful activity during the period from her alleged onset date of June 12, 2012 through her date last insured of June 30, 2017 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: asthma, lumbar degenerative disc disease with spondylosis and radiculopathy, trochanteric bursitis, obesity, depressive disorder and anxiety disorder (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except that she could occasionally climb ladders, ropes or scaffolds, stoop, kneel and crouch. She could frequently climb ramps or stairs, balance and crawl; and she should have avoided[5] concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas. The claimant was further limited to routine tasks with no fast-paced work or strict production quotas; and she was limited to frequent interaction with the public, co-workers and supervisors. Additionally, the claimant was limited to jobs that do not require reading or writing in English above the unskilled level.

---

[5] The Court understands this to mean "should avoid."

20

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born August 26, 1983 and was 33 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of a disability because, using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from June 12, 2012, the alleged onset date, through June 30, 2017, the date last insured (20 CFR 404.1520(g)).

(Tr. 24-41.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

22

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.      The ALJ properly considered the combined impact of Malave's mental disorders, pain, fatigue and inability to handle stress.**

Malave argues that the ALJ erred by failing to properly consider the combined impact of her pain and depression when considering the opinions of her treating doctors, who each had expertise in delivering care in only one of these areas.  (Doc. No. 15 at 11.)  In addition, Malave contends that the ALJ failed to consider the impact of stress on her ability to function as required by SSR 85-15, and failed to consider the impact of her medication on her functioning when he evaluated the medical opinions, as required by SSR 96-8p.  (*Id*. at 12.)

The Commissioner responds that the ALJ properly considered the cumulative impact of Malave's impairments in the following ways: "by referring to claimant's 'impairments' in the plural," determining Malave's RFC "with regard to multiple impairments," and posing a hypothetical question that addresses the impairments in the RFC.  (Doc. No. 17 at 7, citing Tr. 24, 27-28, 29, 33,

23

39.)  He argues that the ALJ stated that he had considered "the entire record," including "side effects associated with her medications." (*Id.* at 7-8, citing Tr. 24, 32.)  With regard to Malave's contention that the ALJ inadequately evaluated her stress, the Commissioner points out that SSR 85-15 does not apply to Malave's case because it "clarifies policies applicable in cases involving the evaluation of solely nonexertional impairments." (Doc. 17 at 8, quoting Titles II & Xvi: Capability to Do Other Work - The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15, 1985 WL 56857 (S.S.A. 1985).)  He also asserts that the ALJ adequately evaluated the impact of Malave's stress and her medication on her functioning. (*Id.*)

In the Sixth Circuit, courts have held that "an ALJ's finding that a claimant's combination of impairments (plural) did not meet or equal the Listings is sufficient to show that the ALJ had considered the effect of the combination of impairments," so long as the ALJ has "conducted sufficient analyses of each of the claimants' impairments after carefully considering the entire record." *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 789 (N.D. Ohio 2002) (citing *Gooch v. Sec'y of Health and Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)).  Such is the case here.  After the Administrative Council remanded the case, the ALJ wrote a detailed and thorough summary of medical evidence in the record  relating to both Malave's physical and mental impairments. (Tr. 24-39.)  In his decision, the ALJ asserts that he considered "the totality of the medical opinion evidence, the objective medical findings, and other medical evidence found in the record" in concluding that "the combination of the claimant's impairments, including asthma, lumbar degenerative disc disease with spondylosis and radiculopathy, trochanteric bursitis, obesity, degenerative disorder, depressive disorder, and anxiety disorder" do not render her disabled. (Tr. 39.)  The standard of review in this area is deferential, and

the ALJ's statements that he considered the combination of Malave's impairments, combined with his detailed assessment of the individual impairments in the opinion, constitute an adequate consideration of the effect of Malave's combined impairments.

The second concern raised by Malave, that the ALJ failed to consider the impact of stress on her ability to function as required by SSR 85-15, is based on a faulty premise. The Sixth Circuit has held that SSR 85-15 "does not apply to [a claimant], who suffers from both exertional and nonexertional limitations." *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008). In addition, the ALJ's opinion evaluates reports from Nadia James, LCSW, that Malave was "easily flustered by stress" and from Dr. Vazquez that Malave "is not able to function even when the stress is less." (Tr. 37.) In both cases, the ALJ gave these opinions limited weight, and deemed them "not consistent with the overall medical evidence." (*Id.*) While Malave may disagree with that conclusion,[6] it is clear that the ALJ specifically considered the impact of stress on Malave's ability to function.

Next, Malave asserts that the ALJ failed to consider the impact of her medication on her functioning when he evaluated the medical opinions. SSR 96-7p specifically provides that, in assessing the credibility of an individual's allegations of disability, one of the factors to be considered is the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms." Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P, 1996 WL 374186 (S.S.A. July 2, 1996). Allegations of a medication's side effects "must be supported by objective

---

[6] The Court also disagrees with the decision to give Dr. Vazquez's treating source opinion limited weight, as explained in section B(1) *infra*.

medical evidence." *Morrison v. Comm'r of Soc. Sec.*, No. 1:14-CV-1059, 2016 WL 386152, at *5

(W.D. Mich. Feb. 2, 2016), *aff'd*, No. 16-1360, 2017 WL 4278378 (6th Cir. Jan. 30, 2017), citing

*Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665  66 (6th Cir. 2004) (where a claimant testified

that she suffered  from dizziness and drowsiness as a result of her medications, the ALJ did not err

in finding that she suffered no side effects where her medical records contain no such reported side

effects to her physicians); *Farhat v. Sec'y of Health & Human Servs.*, No. 91 1925, 1992 WL

174540, at *3 (6th Cir. July 24, 1992) ("[claimant's] allegations of the medication's side-effects must

be supported by objective medical evidence").

The record demonstrates that Malave's medications included Percocet, naproxen,

gabapentin, Vicodin, Lyrica, cyclobenzaprine, Cymbalta, trazodone, loratadine, and lansoprazole.

(Tr. 615, 633, 1049-50.)   Her doctors provided evidence that the medication had a sedative effect

(Tr. 1028, 1032), and Malave testified that they made her sleepy (Tr. 1051).  The medications' side

effects did warrant consideration, and the ALJ's report specifically details his consideration of the

alleged omission.  He writes:

> The claimant testified at her October 16, 2014 hearing that she experiences
> significant side effects associated with her medications, but has typically denied
> side effects to her treating physicians.  In fact, the records document that she has
> at times expressly denied experiencing side effects from her medications.

 (Tr. 31-32.)  Again, Malave's argument is with the conclusions that the ALJ drew from his analysis.

While the record is mixed on this issue, the ALJ had sufficient evidence for his conclusions and was

in his "zone of choice."

**B.      The ALJ committed legal error in failing to evaluate the treating doctors' opinions
pursuant to the requirements of SSR 96-2p.**

Malave argues that the ALJ's failure to consider the impact that her metal disorders had on

26

her pain and her inability to cope with stress, as detailed in her first assignment of error, caused the ALJ to have "a faulty basis for evaluating the treating doctors' opinions." (Doc. No. 15 at 13.) She asserts that "there was no medical opinion that contradicted or was inconsistent with the treating sources' opinions." (*Id.*) She therefore contends that the ALJ lacked substantial evidence to discredit the opinions of her treating psychiatrist, Dr. Vazquez, and her treating physician, Dr. Freiss, which supported a finding of disability.  (*Id.*)

The Commissioner responded that the treating doctor's opinions were weighed appropriately, and that the ALJ laid out the evidence supporting the weight he assigned to each opinion separately, as required by the Social Security regulations.  (Doc. No. 17 at 9-17.)

The Sixth Circuit recognizes that, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight." 20 C.F.R. § 404.1527(c).  Therefore, "as a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id*. § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96 6p, 1996 WL 374180, at *2 (Soc. Sec.

Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart,* 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2).[7]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p,[8] 1996 SSR LEXIS 9 at *9).  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[9]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which

---

[7] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[8] SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017.  SSR 96-2p, 2017 WL 3928298 at *1.

[9] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[10]

---

[10]  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

1.    **The ALJ lacked substantial evidence to find that Dr. Vazquez's opinions were not supported by the evidence.**

Malave argues that the ALJ did not have good reasons to give only limited weight to the two treating source opinions of her long-time psychiatrist, Dr. Vazquez.  She contends that the ALJ's decision to discount these treating source opinions is not based on substantial evidence because the ALJ failed to articulate "good reasons" which are both specific and supported by the evidence of the record as a whole, as required by SSR 96-2p.  (Doc. No. 15 at 14.)  She also points out that the ALJ based his decision on Malave's limitations in social interaction, and did not address the other psychological impairments Dr. Vazquez identified.

The Commissioner argues that the ALJ appropriately identified inconsistencies between Dr. Vazquez's opinion and Malave's mental health records which serve as substantial evidence to discount Dr. Vazquez's opinions.[11]  (Doc. No. 17 at 9.)

In determining that Dr. Vazquez's May 2, 2014 "Assessment of Ability to Sustain Work-Related Activities (Mental)" should be given limited weight, the ALJ relied on Malave's own hearing testimony.  He wrote that:

> Though claimant's mental health treatment notes do show reports of isolation as a symptom of the claimant's depression and the claimant has stated that she prefers to be alone, she has never had any problems getting along with coworkers or supervisors in her past employment and reported that she has no problems

---

[11] The Commissioner does not contest that Dr. Vazquez was Malave's treating physician from October 2012 through her date last insured, June 30, 2017.  It is further undisputed the ALJ rejected virtually all of Dr. Vazquez's specific opinions regarding Malave's functional limitations, including his opinions that she could not complete a normal workday or workweek without interruption from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, maintain attention and concentration for extended periods of time, nor deal with work stress; and that she would be absent at least three times a month because of her impairments.  (Tr. 880, 1026-27.)

30

interacting with people in general. . . . In addition, though claimant's mental health treatment records reflect that her symptoms are related to interpersonal conflicts, the gross majority of these instances are related to situations involving inappropriate behavior by her ex-husband and his significant other. There is little indication in the medical evidence that the claimant has difficulty with social interaction aside from these specific individuals.

(Tr. 36.) Unfortunately, this statement does not reflect the record. The ALJ relied on Malave's hearing testimony for his statements that she got along with coworkers and had no problems interacting with people in general. However, as part of that testimony, she told the ALJ that at her last job - a part time cleaning position that did not rise to the level of "substantial gainful activity" and lasted only 3 months - she essentially ignored the other two members of her work crew: "I would go on like my own way and do my own thing." (Tr. 64.) She also testified that she does not spend time with anyone outside of her family because, "I don't feel sure of myself. Just with the   I, I feel good with them." (Tr. 68.) She testified that she was unable to continue a volunteer job cleaning lunch tables at her children's school because she had "too much depression." (Tr. 71.)

It is true that Malave also testified, "I get along well" when asked how she got along with her "bosses and supervisors and coworkers when you were working," but the context of this question is unclear. The manner in which the ALJ phrased and organized his questions at the second hearing was confusing.[12] (Tr. 83.) Communication at the hearing was additionally complicated by the

---

[12]     The ALJ began the hearing by voicing his intention to "do short sentences" for the interpreter "and I'll give you breaks so that you can do it." (Tr. 60-61.) Unfortunately, that is not what occurred. Towards the end of his questioning of Malave, the ALJ commented, "I asked a lot. It's funny how one question turns in to five, right?" (Tr. 85.) This is an apt reflection of the disorganized way the second hearing unfolded.

participation of an interpreter.[13] (*Id.*)   In response to the Administrative Council's requirement that he obtain additional evidence regarding Malave's past relevant work (Tr. 157), the ALJ asked a long series of questions about the way she performed her past work as a packer, before her alleged date of disability.  (Tr. 74-79.)  He then asked a series of questions about her current physical symptoms (Tr. 80-82), interrupting himself to identify the interpreter for the record.  (Tr. 80.)  Next, he asked a few questions regarding her children.  (Tr. 83.)  Then they had the following exchange:

> Q: I know that you said earlier in your testimony that you like    you tend to isolate.
>
> A: Uh-huh.
>
> Q: But generally, how did you get along with your bosses and your supervisors and your coworkers when you were working?
>
> A: I get along well.
>
> Q: Okay.  And do you have troubles when you go into, like, a grocery store if its crowded?
>
> A: Yes, and I try to go during the week and in the morning, so its not as crowded.
>
> Q: Okay.  Why do you tend to isolate, would you say?
>
> A: I don't feel, I just, I just don't feel well.  Truly, I don't feel well.
>
> Q: But its not because of getting along with your, of your people that you're working around or whatever?  Correct?
>
> A: No.

(Tr. 83-84.)

---

[13]     The ALJ's questioning at the second hearing became so confusing that, at one point, he directed the interpreter not to translate some of his on-the-record questions, and  the interpreter had to clarify what part of his questioning he did want her to translate.  (Tr. 84.)

When answering the ALJ's questions about her social functioning "when you were working," Malave states she was referring to the relationships she had while she was engaged in full-time factory work, before she allegedly because disabled.  (Doc. No. 19 at 4.)  However, in his opinion, the ALJ asserts this colloquy refers to her more recent, unsuccessful attempts at part-time cleaning work. (Doc. No. 17 at 11, citing Tr. 36.)  The Court finds that because this question was reasonably interpreted differently by the ALJ and Malave, her response is too ambiguous to provide substantial evidence in support of giving less than controlling weight her treating psychiatrist's opinion.[14]

The ALJ next explained that he gave "limited weight" to Dr. Vazquez's opinion because "there is little indication in the medical evidence that the claimant has difficulty with social interaction aside from" her ex-husband and his wife.  (Tr. 36.)  This statement does not reflect the record.  While issues surrounding custody of her son and withholding child support were Malave's most-discussed stressors, there is ample evidence in Malave's mental health treatment records that she struggled with social interactions with individuals other than her ex-husband and his wife.  For example:

- Social worker Megan Raimondi-Musser, LSW repeatedly accompanied Malave to medical appointments.  She identified it as "progress" when Malave was able to remain calm during interactions with doctors and nurses. (Tr. 717, 721.)

- Malave had difficulty with basic communication.  On one occasion, Ms. Raimondi-Musser drove Malave to a medical appointment about 30 minutes away, only to learn that it had been cancelled the previous month,

---

[14]  Essentially, Malave and the ALJ were having a conversation - through an interpreter - which neither fully understood.  Because the ALJ had most recently asked Malave a series of questions about her factory work as a packer, her interpretation of the ALJ's less-than-precise question was reasonable, albeit not what the ALJ was asking.

and Malave had been notified twice.  Malave "became frustrated at appointment when told it was cancelled" but told Ms. Raimondi-Musser that "she would have gotten more angry" without her support.  Ms. Raimondi-Musser felt it necessary to "remind client of the importance of understanding phone calls and communicating with clinician or a family member if she did not understand phone calls." (Tr. 714.)

• Malave left her part-time volunteer work wiping down lunch tables at her children's school because she was experiencing "too much depression." (Tr. 71.)

There is little evidence that Malave had social interactions with people outside her family during most of the time at issue, and numerous reports that she was isolated.   The lack of discussion of social interactions outside her family reflects how rarely she interacted with anyone outside her family, not that she was having successful social relationships with people outside of her family.

Third, the Commissioner concludes that because Malave was regularly described as "cooperative" at medical appointments, Dr. Vazquez's opinion was contradicted by his own medical records.  (Doc. No. 17 at 13, Tr. 36.)  But the ability to cooperate with healthcare providers during relatively brief appointments is not the same as the ability to work cooperatively during an 8-hour workday.  The fact that Malave's social worker accompanied her to medical appointments as part of her therapy is evidence that these interactions were difficult for her.  (Tr. 717, 721.)  The records also document multiple instances when Malave failed to show up for scheduled appointments with her mental health care team without calling to cancel the appointment, showing she was not able to appropriately cooperate with care providers on a consistent basis (Tr. 931, 938, 948).

Fourth, the Commissioner argues the ALJ found substantial evidence to support his discounting of Dr. Vazquez's opinion in the fact that Malave attempted to return to work part-time three times during the time she claimed disability "and reported that she stopped working due to

physical issues, not mental health issues." (Doc. No. 17 at 13.)  This, too, is contradicted by the record.  Malave testified that after four hours on a cleaning job, she felt "Very tired. Very depressed," and that she was being fired because "I was doing the job too slow.  And I wasn't vacuuming like I was supposed to." (Tr. 64.)  While Malave was asked why she had problems doing the job, she replied, "Because I lose my balance.  My, my supervisor was telling me I wasn't doing my job correctly, so that it got me depressed."  (*Id.*)  Contrary to the Commissioner's assertion, Malave attributed her inability to maintain even part-time employment to a combination of physical and mental impairments.  The Commissioner also claims Malave's medical records show  that her sole basis for leaving work was physical disability. (Doc. No. 17 at 15.)  However, the document he cites, a treatment note by Dr. Freiss,  reads: "Was able to work for several months then same old pains in R hip (sciatica) returned and now with current meds, just able to do ADL's." (Tr. 974.)  It is logical that a note from her primary care doctor would focus on her physical ailments.  It does not follow that physical symptoms were the sole cause of her inability to continue working, as the Commissioner claims.  Finally, one of Malave's cleaning employers, Quality Assured Cleaning, submitted a statement for the record attesting that she was fired because of poor communication relating to absences: "Employee failed to report for her scheduled shift.  Employee failed to call or notify management that she would not report to work.  Second offense in 90 day probation period. . . . When confronted, employee merely shrugged her shoulders and showed no concern or interest in addressing the issue." (Tr. 464.)  This is exactly the type of self-isolating behavior and maladaptive response to stress detailed in her mental health treatment records.  These attempted employment failures cannot properly be construed as contradicting Dr. Vazquez's opinion.  In fact, they support it.

It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding." *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 at * 6 (N.D. Ohio March 11, 2013); *see also Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 at * 4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis). In his rationale for giving limited weight to Dr. Vazquez's Opinions, the ALJ overlooked evidence favorable to Malave and mischaracterized evidence that was at best ambiguous.  He failed to establish that either Dr. Vazquez's 2014 or 2016 Opinions are unsupported by medically acceptable clinical diagnostic techniques and he has not shown that they are inconsistent with the other substantial evidence in the case record.  In sum, the ALJ's opinion fails to set forth good reasons for discounting the two treating source opinions of Dr. Vazquez.  Accordingly, this Court finds remand is necessary, to afford the ALJ the opportunity to sufficiently address all of the limitations assessed by Dr. Vazquez.

> **2.  The ALJ lacked substantial evidence to find that the portions of Dr. Freiss's opinion stating that Malave's symptoms, including pain and fatigue, prevented her from sustained work activity were not supported by the evidence.**

Malave next argues that the ALJ improperly discounted portions of the opinion of her treating physician, Dr. Freiss, giving "significant weight" to those conclusions he agreed with, but according "limited weight" to others because they were "not consistent with the overall evidence of the record.  She claims that the ALJ's rationale for "rejecting" parts of Dr. Freiss' Opinion that supported a finding of disability was "vague, not supported by the evidence and did not rise to the

36

level of good reasons." (Doc. No. 15 at 22.)

The Commissioner argues that the ALJ reasonably weighed Dr. Freiss' Opinion and appropriately gave less weight those elements which he judged inconsistent with objective medical findings in the record. (Doc. 17 at 16.)

The ALJ gave nearly identical explanations for his decision to give "significant weight" to some elements of Dr. Freiss' opinion, and "limited weight" to others: They either are, or are not "consistent with the overall medical evidence, including the lack of severe findings on objective imaging, inconsistent signs of neurological deficit on physical examinations, and more consistent findings of normal motor strength, sensation, deep tendon reflexes and gait." (Tr. 37.) He then cites numerous treatment records. (*Id.*)

Social Security Rule 96-2p dictates that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96 2p, 1996 WL 374188 at *5 (1996). The Sixth Circuit has held that "a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). Moreover, it is well established that an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physician were rejected." *Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013). Simply put, this Court cannot

37

conduct a meaningful review and conclude that good reasons have been set forth for rejecting a treating physician's opinion where an ALJ recites some of the pertinent evidence of record and follows that recitation with an unexplained conclusion that said opinion is inconsistent with the medical record.  *See Blackburn*, 2013 WL 3977282 at * 7; *Cassels v. Comm'r of Soc. Sec.*, No. 2:15-cv-1459, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for example, 'does not offer any explanation for his conclusion' that 'the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.") (quoting *Blackburn*, 2013 WL 3977282 at * 7); *Sacks v. Colvin*, No. 2:15-cv-2315, 2016 WL 1085381 at *5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opnions and the 'medical evidence of record,' it was just that - a general statement devoid of any specific reference to any portion of the medical evidence.  Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

Therefore, the Court finds the ALJ's reason for rejecting Dr. Freiss' Opinion does not constitute a "good reason" for purposes of social security regulations and recommends that remand is necessary, thereby affording the ALJ the opportunity to sufficiently address all of the physical limitations assessed by Dr. Freiss.

**C.     Award of Benefits Request**

Malave argues that her case should be "remanded for the payment of benefits."  (Doc. No. 15 at 25.)  She maintains that her "case has been pending for many years, the proof of disability is strong and evidence to the contrary s lacking."  (*Id.*)  She argues that "a third hearing will serve no useful purpose," and therefore a remand for payment of benefits is the most appropriate remedy (*Id.*)

38

The Commissioner did not directly respond to this portion of Malave's brief.

The Sixth Circuit has held that "if a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secy. of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted).  Furthermore, an award of benefits "is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id.*  While the Court is sympathetic to the amount of time that has passed since Malave applied for benefits - in particular, the seventeen months that elapsed between her second hearing and the issuance of the ALJ's Opinion - a judicial award of benefits in this case is inappropriate.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and REMANDED for further proceedings consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 22, 2019

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

39